UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

BRENDAN HARR,

       Plaintiff,

v.                                      Case No. 2:19-cv-281-FtM-MAP

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

_____/

**<u>ORDER</u>**

       This is an appeal of the administrative denial of Plaintiff's application for childhood disability insurance benefits (CDIB), payable on his deceased father's account. (R. 97) *See* 42 U.S.C. §§ 402(d)(1), 405(g). Plaintiff, who is now an adult, argues the Administrative Law Judge (ALJ) improperly weighed the vocational assessment authored by Keegan Culver, Psy.D.; failed to incorporate into Plaintiff's RFC all the functional limitations identified by non-examining medical expert Renee McPherson Salandy, Ph.D. at the reconsideration level; did not support Plaintiff's RFC assessment with substantial evidence; failed to weigh the questionnaire authored by Beth Santini, Plaintiff's Exceptional Student Education (ESE) teacher; and erroneously discounted Plaintiff's subjective complaints. After considering Plaintiff's arguments, Defendant's response, and the administrative record (docs. 12, 19), I find the ALJ applied the proper standards, and his decision is supported by substantial evidence. I affirm the ALJ's decision.

    *A. Background*

       Plaintiff Brendan Harr was born on June 13, 1998, and was 19 years old when the ALJ issued his decision. Plaintiff qualified for an Individualized Education Plan (IEP) at his schools in both Georgia (where he started school) and Florida (where he moved with his mom when he

was in the fourth grade). He graduated from a Florida online charter high school with a special diploma.

In his CDIB application, Plaintiff alleges he has suffered from autism spectrum disorder, Tourette's Syndrome (TS), sensory integration dysfunction, and executive dysfunction since he was seven years old. (R. 97) Plaintiff and his mom testified at the hearing. Plaintiff testified his average day involves waking between 10:00 and 11:00 a.m., drinking coffee, and playing his X-box in his room for 15-16 hours. (R. 57-58) He socializes with his girlfriend (she comes over and watches him play Assassin's Creed) and online friends but no one else. Plaintiff lives with his mom, who testified that, when prompted, Plaintiff can cook, clean, and do his own laundry. (R. 86) He had been working part-time at the front desk of a local gym for two weeks as of the hearing date – he applied for a full-time position at the gym, but the manager restricted him to one day a week after observing him during job training. (R. 82)

Plaintiff has been Baker Acted at least three times due to aggressive activity and for what he characterized as a fake suicide attempt. Each time, he had stopped taking his medication. During high school, he moved in with his grandmother for about a year for the protection of his four younger half-sisters. (R. 84) He testified he does not like being on medication because "they [pills] just make me feel too happy . . . Like just not my normal self . . . they just lower my anger I guess . . . And it makes me get out of my mood swings . . . It makes me like think what's going to happen like consequences and stuff." (R. 65-66) He forgets to take his medication about half of the time, and when he does take it, it is because his mom reminds him to do so: "I have to be reminded to take my medicine most of the time." (R. 57) He also forgets his medication at home when he spends the night at his girlfriend's house.

The Commissioner denied Plaintiff's CDIB application, finding "the claimant was not disabled as defined in section 223(d) of the Social Security Act" through the ALJ's June 5, 2018 decision (R. 29)  Specifically, the ALJ found that Plaintiff has the severe impairments of neurocognitive disorders, anxiety and obsessive-compulsive disorder, personality and impulse-control disorders, and autism spectrum disorders.  (R. 17)  Aided by the testimony of a vocational expert (VE), the ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels with the following limitations:

> No work above SVP 2 level.  He can tolerate occasional interactions with co-workers, supervisor and general public.  He can tolerate occasional work setting and work process changes.  No math calculations.  No rapid pace assembly line or fast food type work environments requiring quick response and frequent decision making.

(R. 21)  The ALJ determined that, with this RFC, Plaintiff could work as an auto detailer, janitor, or dishwasher. (R. 28)  The Appeals Council denied review.  Plaintiff, who has exhausted his administrative remedies, filed this action.

### B.  Standard of Review

The Commissioner evaluates a claim for adult child benefits under the same standard generally applicable to adults, by employing the five-step evaluation process described below.  20 C.F.R. §§ 404.1505(a), 404.1520(a)(4)(i)-(v).  To be entitled to benefits, a claimant must be unable to engage "in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *See* 42 U.S.C. § 1382c(a)(3)(A).  A "'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *See* 42 U.S.C. § 1382c(a)(3)(D).

The Social Security Administration, to regularize the adjudicative process, promulgated detailed regulations that establish a "sequential evaluation process" to determine whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. If an individual is found disabled at any point in the sequential review, further inquiry is unnecessary. 20 C.F.R. § 416.920(a)(4). Under this process, the Commissioner must determine, in sequence, the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment(s) (*i.e.*, one that significantly limits his ability to perform work-related functions); (3) whether the severe impairment meets or equals the medical criteria of Appendix 1, 20 C.F.R. Part 404, Subpart P; (4) considering the Commissioner's determination of claimant's RFC, whether the claimant can perform his past relevant work; and (5) if the claimant cannot perform the tasks required of his prior work, the ALJ must decide if the claimant can do other work in the national economy in view of his RFC, age, education, and work experience. 20 C.F.R. § 416.920(a)(4). A claimant is entitled to benefits only if unable to perform other work. *See Bowen v. Yuckert*, 482 U.S. 137, 142 (1987); 20 C.F.R. § 416.920(f), (g).

And, because Plaintiff is over 18 and seeks CDIB, he must also establish (1) he is dependent on an insured parent who is entitled to old-age or disability benefits or has died; (2) he is unmarried; and (3) at the time of filing, he was under age 18, or age 18 or older and has a disability that began before he became 22 years old. 42 U.S.C. § 402(d)(1); 20 C.F.R. § 404.350. In reviewing the ALJ's findings, this Court must ask if substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The ALJ's factual findings are conclusive if "substantial evidence consisting of relevant evidence as a reasonable person would accept as adequate to support a conclusion exists." *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citation and quotations omitted). The Court may not reweigh

4

the evidence or substitute its own judgment for that of the ALJ even if it finds the evidence preponderates against the ALJ's decision. *See Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Keeton*, 21 F.3d at 1066 (citations omitted).

### C. Discussion

#### 1. Did the ALJ properly weigh vocational consultant Keegan Culver, Psy.D.'s report?

Plaintiff argues the ALJ did not assign weight to Dr. Culver's January 20, 2016, vocational rehabilitation evaluation (completed at Plaintiff's request when he was a high school junior). Because of this, Plaintiff's argument goes, it is impossible to determine if substantial evidence supports the ALJ's decision. The Commissioner disagrees and counters that Dr. Culver's report contains mere "recommendations about what would be 'helpful' for Plaintiff to work on while he was in high school in order to obtain a successful career track." (Doc. 19 at 22). The Commissioner also argues the ALJ incorporated Dr. Culver's findings into Plaintiff's RFC.

Dr. Culver, a psychologist, met with Plaintiff once "for a vocational rehabilitation evaluation to establish the nature of any mental disability and to determine any psychological issues or personality features that might affect job performance and employability." (R. 289) To Dr. Culver, Plaintiff "appeared focused and attended. . . . He evidenced slightly blunted affect. He appeared in no acute mental distress" although he became "irritated by the bickering between his mother and grandmother," who accompanied him to the evaluation. (R. 290) Plaintiff's mom relayed that he was diagnosed with ADHD at five years old, Tourette's Syndrome at seven, obsessive compulsive disorder at age eight or nine, and autism spectrum disorder at 11. His mom and grandmother recalled three psychiatric hospitalizations in his past: when he was eight years

old, he was hospitalized for one month "related to problems controlling his anger"; when he was 11 or 12, he was hospitalized for three days "possibly due to threats to harm himself"; and when he was 13 or 14, he was hospitalized for three days because of a suicide attempt. (R. 292) As of the date of Dr. Culver's evaluation, Plaintiff had been taking Abilify (a mood stabilizer and antipsychotic) for three or four years. "He stated that the medication 'calms' him down and helps him refrain from getting angry." (R. 292) Plaintiff recalled feeling more irritable and depressed before he started taking Abilify. Based on Plaintiff's clinical interview and test results, Dr. Culver opined Plaintiff has an unspecified depressive disorder with attendant low self-esteem and interpersonal difficulties. (R. 303)

Plaintiff scored an 84 (low average) on the general intelligence test Dr. Culver administered, yet his verbal comprehension was average – strong enough to indicate "he has sufficient intellectual ability to master vocational coursework. He also has minimally adequate verbal reasoning abilities to complete college-level coursework. He has the verbal reasoning ability to complete written tests and to understand written instructions." (R. 296) Plaintiff's working memory score was low average, indicating "some limitations with respect to his ability to hold and manipulate information in short-term memory." (R. 296-97) He also "has difficulty performing mental arithmetic, while his ability to memorize and sequence rote material is normal for his age." (R. 297) Indeed, his mathematics skills were on a fourth grade level, which "would likely prove to be a significant hindrance to successful completion of college-level and vocational-level coursework." (R. 298)

According to Dr. Culver, Plaintiff "would be expected to have some difficulty remembering and following-through with verbal directives. He would likely need to work problems out on paper or rely on the use of a calculator. He likely would need extra study time

and repeated courses of exposure to information in order to learn." (*Id*.)  Dr. Culver opined that Plaintiff would not excel at timed tasks and is "ill-suited for multi-tasking and/or fast-paced work environments." (*Id*.)  Plaintiff would have "significant difficulty staying and maintaining attention when information is presented visually." (R. 299)  The psychologist continued, "[i]ndeed, his ability to listen and understand the meaning of actions and verbal directions is estimated to be commensurate with that of a 4-year-old child."

Dr. Culver's report concludes with 17 recommendations, including that Plaintiff continue to receive psychiatric treatment, work toward his high school diploma, utilize school services identified in his IEP, obtain help with job applications and interview skills, take notes, avoid multi-tasking, and study in a quiet environment. (R. 305-06)  He would likely need job coaching and "ongoing support in the workplace.  He will likely need guidance and direct supervision to help insure task completion, time management, and stress management." (R. 305)  Dr. Culver acknowledged that his recommendations "have the potential to be helpful [but] it is recognized that practical circumstances may make implementing them unfeasible." (R. 304)

In making his first argument, Plaintiff is correct about one thing: the ALJ did not assign specific weight to Dr. Culver's evaluation.  Instead, the ALJ summarized Dr. Culver's findings in two paragraphs, noting the results of Plaintiff's memory, intelligence, and academic testing as well as Dr. Culver's recommendations and observations that Plaintiff "would require support in any workplace environment that requires interpersonal interaction with clients, customers or coworkers.  He would have difficulty coping with workplace stressors or adapting to workplace changes and demands." (R. 24)  And the ALJ referenced Dr. Culver's report when concluding that the medical evidence does not support disabling limitations (Dr. Culver's report is Exhibit 5F in the administrative record):

In summary, during the period currently at issue, the medical evidence of record establishes the claimant has a history of neurocognitive disorders, anxiety and obsessive-compulsive disorder, personality and impulse-control disorders, and autism spectrum disorder. However, the medical evidence of record fails to support the severe functional limitations alleged by the claimant. Progress notes show claimant is not dysfunctional. While he alleged problems, mental status exams are relatively normal, and do not support a disability that would preclude unskilled work activity. There are acute periods of flat affect, anxious mood and racing thoughts as well as impaired insight and judgment. At times, claimant was noncompliance with follow-up treatments and taking medication. (See exhibits 5F, 6F, 7F, 8F, 11F, 12F, 13F, 14F, 15F, 16F, 17F) Psychiatric treatment and medications were administered, to which claimant responded very well, when he is compliant. There is no consistent evidence for mental health problems more severe than noted. There are no ER visits or urgent care for mental health issues. Medical evidence shows claimant's mental condition improved with consistent treatments and medication management. The undersigned notes that while the claimant may have mental impairments, they are not described to reach disabling proportions.

(R. 26)

Citing *Winschel v. Commissioner of Social Security*, 631 F.3d 1176, 1179 (11th Cir. 2011), Plaintiff argues that this consideration is not enough – that the ALJ erred by not stating the specific weight he assigned to Dr. Culver's opinion. Plaintiff's argument presupposes that Dr. Culver's report is a medical opinion, a point the Commissioner disputes. Under the applicable regulations, medical opinions are "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite your impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Considering this, Dr. Culver's report contains medical opinions.

The next issue is whether the ALJ properly considered Dr. Culver's opinion. The method for weighing medical opinions under the Social Security Act is set forth in the regulations at 20 C.F.R. § 404.1527(c). The opinions of examining physicians are generally given more weight than non-examining physicians, treating more than non-treating physicians, and specialists more than non-specialist physicians. 20 C.F.R. § 404.1527(c)(1-5). A court must give a treating physician's

opinions substantial or considerable weight unless "good cause" is shown to the contrary. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

This rule – the "treating physician rule" – reflects the regulations, which recognize that treating physicians "are likely to be the medical professionals most likely to provide a detailed, longitudinal picture of . . . medical impairment." 20 C.F.R. § 404.1527(d)(2). *Winschel* instructs that with good cause, an ALJ may disregard a treating physician's opinion but "must clearly articulate the reasons for doing so." 631 F.3d at 1179 (*quoting Phillips v. Barnhart*, 357 at 1240 n.8). Additionally, the ALJ must state the weight given to different medical opinions and why. *Id.* Otherwise, "it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981).

Dr. Culver examined Plaintiff one time and never treated him; his opinion was not entitled to great weight. *See Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2017) (noting that a doctor who examines a claimant just once is not a treating physician and thus that doctor's opinion is not entitled to great weight). Nonetheless, the ALJ considered Dr. Culver's opinions and incorporated many of his recommendations into Plaintiff's RFC. For example, Dr. Culver opined that Plaintiff needed extra time to complete tasks, would not perform well at tasks that require a high production yield, and would not multi-task well. (R. 305) In Plaintiff's RFC, the ALJ limited him to only occasional work setting and work process changes and "[n]o math calculations. No rapid pace assembly line or fast food type work environments requiring quick response and frequent decision making." (R. 21) Additionally, Dr. Culver recognized that while his recommendations would be "helpful" to Plaintiff, circumstances may make implementing the recommendations infeasible. (R. 304) Considering this, even if the ALJ committed error in failing

to specify the weight he assigned to Dr. Culver's opinion, this error was harmless – it is clear the ALJ considered the opinion because the ALJ's RFC is largely consistent with it. *See Brown v. Comm'r of Soc. Sec.*, 680 F. App'x 822, 824-25 (11th Cir. 2017) (any error the ALJ made in failing to specify the weight he assigned to treating opinions was harmless because the ALJ considered the opinions, which were consistent with the ALJ's RFC finding); *Trussell v. Comm'r of Soc. Sec.*, No. 8:16-cv-1048-T-24JSS, 2017 WL 2190647, at *6 (M.D. Fla. May 2, 2017) (*report and recommendation adopted at* 2017 WL 2172194 (May 17, 2017)) (finding ALJ committed harmless error in failing to specify weight assigned to treating physician's opinion because RFC was consistent with it). Plaintiff's first argument fails.

### 2. *Does substantial evidence support the ALJ's formulation of Plaintiff's RFC?*

Plaintiff's next argument is two-fold. First, he contends the ALJ erred in not incorporating the limitations identified by Renee McPherson Salandy, Ph.D., a reconsideration level, non-examining expert who opined in January 2017, that Plaintiff is not disabled. (R. 110-13) Second, Plaintiff challenges the ALJ's RFC as based "on [the ALJ's] lay assessment of raw medical evidence despite the complexities of Plaintiff's neurocognitive and psychiatric impairment." (Doc. 19 at 33-34).

Dr. Salandy is an agency expert who reviewed Plaintiff's medical records in January 2017, at the reconsideration level and opined Plaintiff is not disabled. She wrote:

> Clmt should be able to understand and remember both simple and detailed instructions. Clmt may have intermittent disturbances from mental impairments but can follow two-three step commands and can persist and maintain attention and concentration for two hour increments sufficiently enough to complete an eight hour workday. Clmt may function best in an environment with minimal social interaction with the general public and co-workers and a supportive management style. Clmt may have mild adaptive limitations due to mental health sxs but possesses capacity to make reasonable decisions and adapt to routine changes in

workplace.  Clmt can engage in SGA in a supportive routine environment with minimal social interaction.

(R. 113)  The ALJ afforded this opinion "partial weight," finding Plaintiff was slightly more limited:  rather than endorse Dr. Salandy's across-the-board mild adaptive limitations, the ALJ found Plaintiff suffers from "mild limitations in understanding, remembering, or applying information, *moderate* limitations in interacting with others, *moderate* limitations in concentrating, persisting, or maintaining pace, and *moderate* limitations in adapting or management oneself." (R. 26) (emphasis added).  But to Plaintiff, the ALJ's opinion diverges from Dr. Salandy's so much that it is impossible to discern which part of the opinion the ALJ credited and which part he discounted.

A claimant's RFC is the most work he can do despite any limitations caused by his impairments.  20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1).  In formulating a claimant's RFC, the ALJ must consider all impairments and the extent to which the impairments are consistent with medical evidence.  20 C.F.R. §§ 404.1545(a)(2), (e); 416.945(a)(2), (e).  This includes both severe and non-severe impairments when determining if the claimant can "meet the physical, mental, sensory, and other requirements of work."  20 C.F.R. §§ 404.1545(a)(4); 416.945(a)(4).  An ALJ may not arbitrarily reject or ignore uncontroverted medical evidence.  *McCruter v. Bowen,* 791 F.2d 1544, 1548 (11th Cir. 1986) (administrative review must be of the entire record; accordingly, ALJ cannot point to evidence that supports the decision but disregard other contrary evidence).  Ultimately, under the statutory and regulatory scheme, a claimant's RFC is a formulation reserved for the ALJ, who must support his findings with substantial evidence.  *See* 20 C.F.R. §§ 404.1546(c); 416.946(c).

As explained in the previous section, Dr. Salandy as a non-examining agency doctor is not a treating source, and her opinion is not entitled to considerable weight. *See* 20 C.F.R. § 404.1527(c)(1-5). The ALJ considered it, assigned it partial credit, and then explained his rationale: "[m]edical evidence shows claimant's mental condition improved with consistent treatments with medication management. For the most part, claimant's mental impairments are under appropriate control with medications when the claimant is compliant. With continued formal care and compliance, he would likely improve in functionality." (R. 27) Although Plaintiff emphasizes the ALJ did not incorporate all of Dr. Salandy's limitations into his RFC (for example, the limitation to two-three step commands) and did not parse out which of Dr. Salandy's limitations he was specifically rejecting and why, he was not required to do so. The ALJ simply is not required to address every aspect of every piece of medical evidence. See *Denomme v. Comm'r of Soc. Sec.*, 518 F. App'x 875, 877 (11th Cir. 2013). Here, the ALJ's RFC determination incorporates those limitations identified by Dr. Salandy that the ALJ found credible.

This segues into the second part of Plaintiff's argument, that substantial evidence does not support the RFC determination in general. I disagree. Plaintiff's school records as far back as first grade document his behavioral and academic struggles. The school psychologist at Poole Elementary in Dallas, Georgia, noted Plaintiff's teachers' observations that he displays various ticks "and that he engages in mimicking utterances that he has previously heard." (R. 261) Plaintiff's cognitive functioning "ranges from the Average to Significantly Above Average (Very Superior) ranges of ability. He performed significantly better on tasks requiring nonverbal reasoning and fluid-analytic abilities than on tasks requiring verbal reasoning and crystallized abilities." (R. 266) His limited word recognition and decoding skills "interfered most significantly with his progress in the area of reading comprehension." (*Id.*) According to records from Lee

Mental Health Center, Inc., when Plaintiff was in the fourth grade his mom referred him for a mental health screening after he made homicidal and suicidal threats. (R. 427) His mom reported that he was shaking his baby sister at the top of the stairs at their house and then punched a hole in the wall. (*Id*.) He was disruptive during the screening. (R 434) Later in fourth grade, Plaintiff's school psychologist assessed him with average intellectual functioning but his "academic testing reflects academic skills that are below expected levels for his age, grade, and intellectual potential." (R. 273) During this time period, Plaintiff was trying different medications to control his symptoms, including Adderall, Ritalin, Trileptal, Strattera, and Risperdal. (R. 427)

There is a gap in Plaintiff's records between 2009 and 2013. In February 2013, mental health providers at Salus Care counselled Plaintiff to "use all electronics appropriately not using technology to send naked photos of himself to others at all times." (R. 277) In May 2013, he was struggling with anger outbursts, physical aggression, and excessive absences from school. And by September 2013, Plaintiff had a violent argument with his mom, because he stole $750.00 from her and used her credit card without asking. She called the police, and he was Baker Acted. (*Id*.) It appears he was then sent to the Oasis Youth Shelter, where he "got into conflicts with peers." (*Id*.) He admitted to mood swings and oppositional behavior and said, "I am still mad at the police." (R. 275) His ESE progress reports from 2015 and 2016, show his school attendance (erratic to this point) was improving, and he passed his Algebra class with an A. (R. 452)

In 2014, Plaintiff "took a hiatus" from mental health treatment (R. 334), which led to his being Baker Acted again in January 2015: Plaintiff told police he wanted to kill himself and "Brandon had several scratches on his forearms when asked about them he said it was a joke and he also poured fake blood on his arms as well. Finally Brendon's mother explained that he is

Bipolar and his doctor recently changed his medication but he is not taking his meds." (R. 339-40) Plaintiff was prescribed Lamictal at the time.

So, Plaintiff returned to treatment at Salus Care in February 2015, "after a 12 month hiatus (during which pt stopped his medication and exhibited increasingly intrusive aggression, mood instability and oppositional bx's)." (R. 334)  Salus Care records from 2015 and 2016, document Plaintiff's mood swings, academic struggles, anger outbursts, depression, and anxiety.  Alan Davick, M.D. was Plaintiff's child psychiatrist who diagnosed him with bipolar disorder, ADHD, and Tourette's Syndrome.  Although Plaintiff had tried "Risperdal, Geodon and Lamictal" in the past, Dr. Davick noted he "responded well to Abilify 10mg HS alone during the 6 mos prior to his last visit.  Today, pt returns requesting resumption of Abilify and verbally committing to medication compliance." (R. 334)  Two months later – April 2015 – Plaintiff and his grandmother (who accompanied him to his appointment) told Dr. Davick that his symptoms had generally improved with only "rare rage episodes." (R. 330)  He was "much improved overall."  Plaintiff "believes a slight dose adjustment in Abilify may improve mood stability further." (R. 332)  Dr. Davick increased his Abilify dose to 15 mg.

In June 2015, Plaintiff treated with nurse practitioner Segev Zuzana at Salus Care, seeking a medication refill.  Ms. Zuzana observed he had good insight and judgment, coherent and logical thought processes, and normal speech. (R. 328)  He was making progress overall:  "Grandmother reports pt had a good response to the increased dose of Abilify (increased to 15 mg at the last visit). Pt's mood has stabilized and his anger has abated. . . . He has a summer break now and is leaving to WI next week or 2 months with his girlfriend and her family." (R. 328)  Ms. Zuzana refilled his prescription with enough medication to last Plaintiff through the summer.

14

In August 2015, with Plaintiff back from Wisconsin, Dr. Davick observed that he "continues to contend with deficient social-adaptive skills, anger management and motivational issues, but has made substantial progress in all these parameters. . . . his response to Abilify has been gratifying." (R. 318)  In December 2015, Plaintiff told Dr. Davick he was getting all F's in the second semester of his junior year.  Although he lacked motivation for academics, he was still making progress. (R. 311)  Abilify was helping.  The next month, Dr. Culver evaluated Plaintiff (discussed above).

Plaintiff returned to Dr. Davick in May 2016, shortly before his eighteenth birthday when he would transition to an adult provider.  The psychiatrist recorded:

> He had been stable on Abilify 15 mg QAM at time of his last session 6 mos ago, but elected to [discontinue] his medication and was lost to [follow up] in the interim.  Pt exhibits deficits in social-adaptive skills and motivation, but had been making progress in all these areas till his last visit.  In past, pt had taken Risperdal, Geodon and Limictal, but his response to Abilify was dramatic. . . . Soon after stopping Abilify, both pt and GM attest, anger issues and mood cycling re-emerged. He was able to procure Abilify refill and presents today requesting continuation of that regimen.

(R. 307)  According to Dr. Davick, Plaintiff demonstrated fair judgment and insight, coherent and logical thoughts, and he was oriented in all spheres. (R. 308)

Once 18, Plaintiff treated with Eric Leonhardt, D.O., of Salus Care who, in October 2016, "agree[d] to continue with the Abilify (brand name) as this has been effective for many years." (R. 418)  Plaintiff had a severe reaction to the generic form of the medication, but his insurance company would not authorize the brand name: "He is now out of the Abilify and does not tolerate the generic (vomiting) and the insurance company does not want to approve the brand name medication that has been effective for him.  Mood and affect are more labile and he is more reactive." (R. 422)  Dr. Leonhardt wrote that he would try to convince the insurance company to

15

authorize the brand name and, in the meantime, switched Plaintiff to Trileptal "for impulsivity/reactivity and mood lability." (R. 423)

Dr. Leonhardt's next psychiatric medication management note, from June 2017, states: "He is partially compliant with the medications. He does admit that he misses a couple of days of medications each week." (R. 465) Plaintiff's mom (who was with him at the appointment) relayed that she can tell when he misses his medication. Then, in July 2017, a setback – Plaintiff was Baker Acted for a third time. Records of the Cape Coral Police Department quote Plaintiff: "I pushed my grandma because she was yelling at my girlfriend over a piece of pizza." (R. 532) The responding officer wrote, "Brendon is bi-polar and not taking his medication. Brendon became angry at his grandmother and pushed her causing her to fall." (*Id.*) Plaintiff admitted he gets angry when he is off his medication and that he forgets to take his medication "frequently." (*Id.*) Yet at his August 2017, post-discharge appointment with Dr. Leonhardt, Plaintiff reported he had been compliant with his Abilify regimen (he had apparently switched from Trileptal back to Abilify) for a month and had fair judgment and insight, appropriate mood, oriented in all spheres, and coherent and logical thought processes. (R. 533-34) He denied further episodes of rage or irritability, and his grandmother agreed. (R. 540)

At this point in my analysis, I reiterate that, when reviewing an ALJ's decision, my job is to determine whether the administrative record contains enough evidence to support the ALJ's factual findings. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, ___ U.S. ___; 139 S.Ct. 1148, 1154 (2019). "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Id.* In other words, I am not permitted to reweigh the evidence or substitute my own judgment for that of the ALJ even if I find the evidence preponderates against the ALJ's decision. *See Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

Considering this, and that Plaintiff responded well to consistent mental health treatment and medication management, substantial evidence supports the ALJ's RFC determination that Plaintiff could perform a full range of work.

### 3. Did the ALJ properly weigh the opinion of Beth Santini, Plaintiff's ESE teacher?

Next, Plaintiff contends the ALJ erred by not stating the weight he assigned to the teacher questionnaire completed by Plaintiff's ESE teacher Beth Santini in October 2016. The Commissioner retorts that the ALJ was not required to give the questionnaire any special significance, because it was not a medical opinion. I find that the ALJ appropriately considered Ms. Santini's opinion.

Ms. Santini wrote that she had seen Plaintiff every day he was at school from January 2016, until October 2016 (the date of the questionnaire), and that he "requires substantial assistance to stay focused and complete his work. . . . Brandon has significant problems attending to his assignments. He is taking online classes in a charter school setting. He needs continual prompting to stay on task." (R. 406-07) She noted he has no trouble interacting with others, no problems moving or manipulating objects, and no problems with personal hygiene. Yet he required "direct assistance to stay on task and complete his work." (R. 411) The ALJ summarized this questionnaire in a lengthy paragraph, in a section of his opinion devoted to discussing Plaintiff's school records. (R. 23) Later, the ALJ stated he "considered, but gives partial weight to the 3rd party reports." (R. 27)

Ms. Santini is not a medical source, and the ALJ is not duty-bound to weigh it as such. Plaintiff points out that Social Security Ruling 11-2p, regarding documenting and evaluating disability in young adults, provides that the agency considers "all relevant evidence in the case record to determine if a young adult is disabled." SSR 11-2p. This includes non-medical sources

such as teachers and counselors. *Id.* But the ruling does not require an ALJ to assign a certain weight to a teacher's opinion. Here, the ALJ appropriately considered Ms. Santini's opinion, fashioning an RFC for only occasional work setting and work process changes and no rapid pace assembly line jobs. Plaintiff's third argument fails.

### 4. Does substantial evidence support the ALJ's evaluation of Plaintiff's subjective complaints?

Finally, Plaintiff contends the ALJ did not have substantial evidence to discount his statements about how his mental health symptoms impact his ability to function. The ALJ stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(R. 22) This language directly addresses the Eleventh Circuit's pain standard and is not improper *if* supported by substantial evidence. *See Danan v. Colvin*, 8:12-cv-7-T-27TGW, 2013 WL 1694856, at * 3 (M.D. Fla. Mar. 15, 2013).

To backtrack, the Eleventh Circuit has crafted a three-part pain standard to apply to claimants who attempt to establish disability through their own testimony of subjective complaints. The standard requires evidence of an underlying medical condition and either (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition, or (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain. *See Holt v. Sullivan*, 921 F.2d 1221 (11th Cir. 1991).

When the ALJ decides not to credit a claimant's testimony as to his pain, she must articulate explicit and adequate reasons for doing so. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). Social Security Ruling 16-3p cautions that "subjective symptom evaluation is not an

examination of an individual's character." *Id.* Adjudicators, as the regulations dictate (*i.e.*, 20 C.F.R. § 404.1529), are to consider all the claimant's symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the record. *Id.* The regulations define "objective evidence" to include medical signs shown by medically acceptable clinical diagnostic techniques or laboratory findings. 20 C.F.R. §§ 404.1529. "Other evidence," again as the regulations define, includes evidence from medical sources, medical history, and statements about treatment the claimant has received. *See* 20 C.F.R. § 404.1512(b)(2)-(6). In the end, credibility determinations are the province of the ALJ. *Mitchell v. Comm'r of Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2014).

Based on my review of the medical records and Plaintiff's testimony – summarized above – I find that substantial evidence supports the ALJ's decision to discount Plaintiff's complaints of disabling symptoms. Plaintiff says his difficulty interacting with others and inability to complete tasks keeps him from working. Yet he testified that when he complies with his treatment, his anger is abated and he thinks clearer, and he can take care of himself, travel with his girlfriend, and interact with his family. Plaintiff's mom testified that "the medicine works if he takes it." (R. 84) And, "[i]f he is on the medication, he's – he's pretty stable, but it has to be the Abilify. If they try to put him on a generic brand of the Abilify or if they try to switch it to [ ] Adderall or Risperdal or, you know, all these different other medications that they've given him, none of them work. It's only this one specific medication that works." (R. 85) Plaintiff's treatment records also document his stable condition when he complies with mental health treatment and medication. Plaintiff's argument fails.

*D.  Conclusion*

For the reasons stated above, it is ORDERED:

(1) The ALJ's decision is AFFIRMED; and

(2) The Clerk of Court is directed to enter judgment for the Commissioner and close the case.

DONE and ORDERED in Tampa, Florida on February 20, 2020.

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE